UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

MARIANNE SPINELLI,

                                    Plaintiff,

                    -against-

CITY OF NEW YORK, LAW DEPT., et al.,

                                    Defendants.

-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 8/30/2016 __

13-CV-07112 (GBD)(SN)

**REPORT AND
RECOMMENDATION**

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE GEORGE B. DANIELS:

Pro se plaintiff Marianne Spinelli worked as a paralegal in the New York City Law Department. In her amended complaint, she claimed that the Law Department and her supervisors Jenny Montana O'Connor and John Orcutt violated her rights under the Age Discrimination in Employment Act of 1967 ("ADEA"), the New York State Human Rights Law ("NYSHRL"), and the Family Medical Leave Act ("FMLA").

According to Spinelli, the defendants effectively demoted her from paralegal to a clerical position when they made her a full-time receptionist. She argued that the demotion was caused by age-based animus and was made in retaliation for her exercise of FMLA benefits. She asserted age discrimination and hostile work environment claims against the Law Department and Montana O'Connor, and FMLA interference and retaliation against the Law Department and Orcutt.

The defendants argue that the undisputed facts entitle them to summary judgment on all claims. According to the defendants, Spinelli's discrimination and hostile workplace claims hang

by a slender thread—two arguably discriminatory remarks made by her supervisor Montana O'Connor. In their view, the record shows that Spinelli was given tasks commensurate with her abilities and that she suffered no adverse employment action caused by age discrimination. They also contend that Spinelli's ADEA claims are time-barred and her FMLA claims are meritless.

The Court should enter summary judgment on Spinelli's ADEA claims because they are time-barred. Her FMLA claims are meritless because she cannot prove that the defendants withheld any FMLA benefits or retaliated against her for exercising them. She also cannot prove any hostile work environment claim, and the defendants should be granted summary judgment on those claims. The Court should deny summary judgment on Spinelli's NYSHRL age discrimination claims because disputes remain regarding whether the diminution of Spinelli's duties constituted an adverse employment action and whether the defendants' proffered reason for taking that action is credible.

## **BACKGROUND**

### I.    **Spinelli's Rule 56.1 Statement**

As a preliminary matter, the defendants argue that their Rule 56.1 Statement should be adopted in its entirety because Spinelli failed to follow fastidiously Rule 56.1's requirements. Because Spinelli appears pro se, the Court will review her submissions liberally and conduct an independent investigation of the record to determine whether it supports her claims.

Local Rule 56.1 requires a party moving for summary judgment to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1(a). The opposing party must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate,

short and concise statement of additional material facts as to which it is contended that there

exists a genuine issue to be tried." Local Rule 56.1(b). Facts in the moving party's Rule 56.1

statement that were not contested "by a correspondingly number paragraph" in the opposing

party's statement are deemed to be admitted. Local Rule 56.1(c). Each statement of fact "must be

followed by citation to evidence which would be admissible" at trial. Local Rule 56.1(d). "The

purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by

freeing district courts from the need to hunt through voluminous records without guidance from

the parties." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001). Local Rule 56.1

does not, however, "absolve the party seeking summary judgment of the burden of showing that

it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a

vehicle for making factual assertions that are otherwise unsupported in the record." Id. Even an

uncontroverted Rule 56.1 statement cannot establish a fact for the purposes of summary

judgment if it is not supported by admissible evidence. See Giannullo v. City of New York, 322

F.3d 139, 140 (2d Cir. 2003).

Spinelli submitted an incomplete response to the defendants' Rule 56.1 statement. She

responded selectively to the defendants' numbered factual assertions and, in some cases, did not

rely on admissible evidence for her counter-assertions. Were Spinelli a counseled litigant, the

Court may very well be justified in deeming the bulk of the defendants' properly supported

factual assertions to be admitted. See, e.g., Suares v. Cityscape Tours, Inc., 11-cv-5650 (AJN),

2014 WL 969661, at *2 (S.D.N.Y. Mar. 12, 2014); Emanuel v. Griffin, 13-cv-1806 (JMF), 2015

WL 1379007, at *1-2 (S.D.N.Y. Mar. 25, 2015). But Spinelli appears pro se, and the Court must

read her papers "liberally," construing them "to raise the strongest arguments that they suggest."

Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). Accordingly, the Court will use its

discretion "to conduct an assiduous review of the record" to determine whether Spinelli's assertions have record support. <u>Holtz</u>, 258 F.3d at 73 (internal quotation marks omitted).

## II.     Factual Background

The following facts are taken from the Court's review of the summary judgment record.

### Spinelli's Initial Appointment as an MBU Paralegal

In December 2008, the Law Department hired Plaintiff Marianne Spinelli as a paralegal in the Manhattan Borough Unit ("MBU"). Then 68 years old, Spinelli was the oldest paralegal in her unit by at least 10 years. <u>See</u> ECF No. 193-2 at 10.

The position required applicants to pass a civil service exam. Under the New York State Civil Service Law, appointment to a civil service position "shall be made by the selection of one of the three" highest scorers on the exam. N.Y. Civ. Serv. Law § 61(1). This is known as the one-in-three rule. Earlier that year, Spinelli passed the exam and was one of the top three scorers to apply for her position.

Spinelli's other qualifications included prior paralegal experience, a paralegal certificate, and a bachelor's degree. A May 2007 letter from Spinelli's prior employer states that she was "conscientious, dependable, works hard" and requires "minimal supervision." ECF No. 193-4 at 4. The letter also describes Spinelli as "organized, and effective in maintaining large case files and doing the necessary research." <u>Id.</u> And because of her "diligence and willingness to go 'above and beyond,'" she "developed good working relationships with counsel and the regulatory agencies." <u>Id.</u>

Spinelli interviewed with Defendant John Orcutt, then MBU's Assistant Borough Chief. Orcutt recommended Spinelli's appointment to Defendant Jenny Montana O'Connor, then MBU's Borough Chief, who gave Spinelli the job. Her job responsibilities included requesting

4

documents and medical files, processing authorizations, sending correspondence, and entering litigation data into MBU's case management system and document automation software.

## MBU Performance Evaluations

In a declaration prepared for this litigation, Montana O'Connor claimed Spinelli "performed unsatisfactorily during the majority of her employment in MBU prior to her September 2010 resignation." ECF No. 142-1 at 7. She "lacked a working knowledge of the City's client agencies, their structure, and available resources" and "struggled to keep abreast of her assignments." Id. According to Montana O'Connor, Spinelli received an "Unsatisfactory" rating on a May 2009 evaluation. Id.  But the record includes no contemporaneous documentation of this review or of any admonishments, reprimands, or disciplinary action from this period.

The record does include what appear to be four performance evaluations rating Spinelli's performance as "good" or "outstanding." One evaluation described Spinelli as a "refreshing addition" who had "a superlative work ethic" and "a genuine commitment to performing at her best." ECF No. 193-4 at 12. It stated that Spinelli worked closely with her supervisor to improve her work quality and time management and recommended continued improvement in those areas. Id. It concluded by encouraging Spinelli's supervisors to "assign her more complex and high-exposure matters to further enhance her professional development." Id.

A September 2009 evaluation gave Spinelli an overall "good" rating. ECF No. 193-5 at 1. But although the review noted that Spinelli had shown "improvement in her overall performance and work product," it suggested that she continue to "devote additional effort towards tracking her cases" and "also become more diligent with regard to maintenance and placement of files." Id. at 1-2. One undocumented sick leave and 16 latenesses occurred during the evaluation period.

Id. at 2. Accordingly, Spinelli was to "devote additional effort toward reducing her number of accrued latenesses." Id.

In December 2009, Spinelli was told that all eligible employees' probations were being extended. In her deposition, Spinelli testified that she was told that if she did not sign the extension immediately upon receipt, she would be fired. ECF No. 142-1 at 71. Spinelli also recalled that the director of Human Resources screamed at her "so harshly" that she "went to the bathroom" and "threw up." Id. at 71. Spinelli asked to meet with Montana O'Connor and her supervisor Michael Chadirjian. ECF No. 193-4 at 10. Montana O'Connor wrote that she stood by her performance evaluation. Id.

Months later, Spinelli received an "outstanding" review that lauded her for her improvement and stated that she had "flourished" since her last evaluation. ECF No. 193-5 at 8. It called her "an integral member of the intake litigation team." Id.  The record also includes an additional 2010 evaluation giving Spinelli "good" to "very good" ratings. ECF No. 193-5 at 4.

### Spinelli's Stress-Related Leave of Absence

Spinelli was mostly satisfied with her job at MBU. But she had a history of panic attacks and felt there was racial tension in the office, increasing her anxiety and stress. Spinelli informed the Law Department that she had been diagnosed with post-traumatic stress disorder after she started working there. ECF No. 142-1 at 87-88. She reported fainting twice at work. Id. at 145.

So, in September 2010, Spinelli took a yearlong leave of absence to work as a Police Administrative Assistant ("PAA") for the New York Police Department. ECF No. 142-1 at 41.

### Spinelli's Return to the Law Department & Transfer to the Staten Island Tort Unit

In late July 2011, Spinelli told the Law Department's Chief of Personnel that she planned to return to her paralegal position at the Law Department. ECF No. 193-6 at 8. She was assigned

over her objection to the Staten Island Tort Unit ("SITU"), where Ann Broderick was the office's Supervising Attorney. ECF No. 142-1 at 22. There, Spinelli was responsible for preparing discovery responses and records requests for cases where the Department of Transportation was the client agency. Id. at 23.

**Defendants' Purported Dissatisfaction with Spinelli's Performance & Quality of Work**

In a declaration prepared for this litigation, Broderick claimed that Spinelli failed to meet her performance expectations. She alleged that Spinelli's "draft responses required edits for typographical mistakes, did not mirror the Court Orders, and the annexed records had not been checked for accuracy." ECF No. 142-1 at 24. She claimed that Spinelli had issues with "lateness and attendance" and that her "poor performance and frequent absences led to a significant morale problem with other support staff members." Id. at 25.

**Spinelli's Concern Regarding Out-of-Title Work and Other Issues**

According to Broderick, the SITU's entire support staff included four paralegals who were expected to share in clerical duties like filing, mail processing, and opening the reception door. ECF No. 142-1 at 23. But Spinelli claims that younger paralegals were not assigned clerical work. According to Spinelli, when she expressed concern about doing clerical work, Broderick responded: "Well, I need my phone answered." Id. at 46. Spinelli also complained that any paralegal work assigned to her was completed by other paralegals. Id. Spinelli's concerns regarding out-of-title work were documented in an October 27, 2011 email to the Law Department's Chief of Personnel, where she lists the clerical duties she was required to perform including: "typing, filing, opening the mail and answering the phones." ECF No. 193-7 at 4. In this e-mail, Spinelli also complained that Broderick was not "very receptive" to her concerns and ignored her at work. Id. She also noted that all of her colleagues lived in Staten Island and that

her commute was excessively long, costly, and, stressful, and consequently, detrimental to her health. Id. She asked to be provided with other paralegal openings, but Hobbs responded that there were none. ECF No.193-6 at 12. She requested and was granted a medical accommodation allowing for flexible arrival time.

### Spinelli's Transfer to the Manhattan Risk Management Unit

On November 28, 2011, Spinelli was transferred to the Risk Management Unit ("RMU") in Manhattan. There, she was assigned to a large discovery project overseen by Nancy Savasta that required her to research and print related documents. In a declaration prepared for this litigation, Savasta claimed that Spinelli "immediately fell behind completing her assignments and was not in compliance with the requirement of submitting a daily count of cases completed." ECF no. 142-1 at 19. Savasta also said that Spinelli deviated "from the procedure for case review by researching multiple cases in one database and then moving to the next database, with the result that she commingled case results and the work had to be redone." Id. She claimed that Spinelli's immediate supervisor "had regular exchanges with her regarding errors and misrepresentation in her reporting both in email and in person meetings." Id. The record does not include any contemporaneous documentation of these admonishments. Savasta also claimed that in February 2012, the RMU conducted an audit of Spinelli's work and found that Spinelli "either failed to complete the data entry or did so incorrectly in 18 out of 89 cases she had reported as completed." Id. at 20. She claimed that a further review showed errors in 253 of Spinelli's cases, and, ultimately "all of this work had to be reassigned." Id. The record contains no contemporaneous documentation of these reviews and no contemporaneous evidence that Spinelli was ever reprimanded for failing to complete her assignments during this period.

By then Spinelli discovered that she was not given software used by other paralegals, which made her assignments more difficult to complete quickly and accurately. ECF No. 193-8 at 3. And soon after, Spinelli complained that her print jobs were routinely being removed from the printer so that she could not retrieve them. Id. at 4. Around that time, Spinelli requested to be transferred back to MBU.

### Spinelli's Return to MBU

Before Spinelli's transfer, Montana O'Connor had an email conversation with Chadirjian dreading her return and proposing to assign her simple tasks. Montana O'Connor wrote: "if we're forced to take back marianne (i'm going to choke—and i can't believe we are being blamed for her poor performance too!), she might be able to add the demands and offers for all esc/mediations. its not a tough thing to do." ECF No. 142-1 at 101. Chadirjian replied: "unless she completely lost it, she was able to do it before she left us." Id. Montana O'Connor replied: "i do not want her back at any cost but we're being punished for giving her a good eval (let me remind you whenever you want to give a marginal person a good review again—its just not worth it—even if there isn't a rating for a so-so employee.)" Id. She proposed stationing Spinelli at the front desk and assigning her clerical duties.

 With that decided, Montana O'Connor wrote to Spinelli: "While I'm not in a position to offer you the same position you occupied before you left, I have a number of tasks that require your immediate attention. These tasks require the attention of a mature and responsible person like yourself." Id. at 105. The tasks included "full time coverage of the reception desk," processing pre-trial authorizations, and reviewing and entering reports into a document tracking program. Id.

In an email, Spinelli responded that because the work was out-of-title, the assignment violated the Department of Citywide Administrative Services ("DCAS") rules. ECF No. 193-3 at 6. Montana O'Connor replied that the "only non-paralegal function noted is handling of the reception desk." Id. She claimed that Spinelli could perform tasks that were below her current title without violating DCAS rules. Id. Spinelli wrote to her union representative claiming that she was "being humiliated out of a job." ECF No. 193-10 at 9.

In anticipation of Spinelli's transfer, Chadirjian wrote that they were "taking bets if she shows." ECF No. 193-8 at 5. Montana O'Connor replied: "sure she's on her way to the union today." Id.

The next day, Montana O'Connor sent an e-mail to MBU staff stating that "Marianne will be designated as our full-time receptionist." ECF No. 193-3 at 5. Her new duties included opening the bathroom door for visitors. Id. at 12. And according to Spinelli, she was "the only paralegal ever reduced to being a receptionist." ECF No.142-1 at 90. Spinelli also said that on several occasions her colleagues poked her in the back and told her that she did not open the door fast enough. ECF No.142-1 at 57. In several e-mails to her union representative, Spinelli noted that she was also made to work in extremely cold temperatures. ECF No.193-10 at 11-12. Despite her complaints, Spinelli claims that the union "never responded," and she continued having issues at work. ECF No. 142-1 at 70.

In May 2012, Spinelli was granted 12 weeks FMLA intermittent leave between April 26, 2012 and April 25, 2013. Id. at 111. She claims that Orcutt told her: "well, this isn't going to make you very popular." Id. at 128. Orcutt disputes that he made this statement when she received her FMLA accommodation and claims that he said it earlier, on April 9, 2012, when

Spinelli told him that she would not be able to arrive at work by 9:00 a.m. See ECF No. 142-1 at 13 (Orcutt Decl.).

At some point in the spring or summer of 2012, Spinelli claims, Montana O'Connor asked her "How much longer can you work, anyhow?" Id. at 80-81 (Spinelli dep.). Spinelli believed that Montana O'Connor was referring to her age and the possibility that she would retire soon. Montana O'Connor does not deny making this statement but dispute that it was a "derogatory comment" about Spinelli's age. See ECF No. 142-1 at 10 (O'Connor Decl.).

Early that summer, Spinelli was made responsible for outgoing mail. ECF No. 193-4 at 1. Montana O'Connor also requested that she be trained to provide backup coverage at the Examination Before Trial Desk ("EBT Desk"). But because she considered the task out-of-title, Spinelli refused. On July 16, 2012, Orcutt wrote Montana O'Connor that Spinelli "said she is not planning on sitting at reception anymore as she considers it not her job." ECF No. 193-8 at 10.

In a declaration prepared for this litigation, Montana O'Connor wrote that Spinelli "performed her tasks in an erratic and unsatisfactory manner," frequently "arrived late to the reception desk without notifying her immediate supervisor, left the reception desk for extended periods of time without notifying her immediate supervisor, failed to timely review and enter necessary information into the Hotdocs Intake Form, and failed to timely process or follow up on pre-trial authorizations." ECF No. 142-1 at 9.

Orcutt also claimed that he "received verbal complaints about Spinelli being rude to visitors, not checking visitors in the log book and generally ignoring them." Id. at 15. He provided details concerning three distinct complains. On one occasion, Spinelli mistakenly sent away a witness who had arrived for a scheduled deposition. When her error came to light, she neither apologized to the witness nor acknowledged her mistake. Orcutt also claimed that

11

Spinelli mistakenly sent away a deponent who was present pursuant to a court order. When the attorney on the case asked Spinelli to sign an affidavit explaining the error to the court, she reportedly refused. In a third incident, Orcutt claimed that Spinelli kept a witness waiting for three hours. Orcutt claimed that he received complaints about Spinelli's erratic lunch break schedule from her colleagues. And due to Spinelli's frequently late arrival, backup schedules were circulated to provide coverage for the reception desk.

### Medical Leave of Absence

On August 7, 2012, Spinelli stopped reporting to work. Orcutt stated that after her departure, he "found a drawer full of undone work that had been assigned to [her]." ECF No. 142-1 at 15-16. By October 22, 2012, Spinelli had exhausted her 2012 FMLA accommodation. So, beginning the next day, the Law Department designated her as absent without leave, later amending that designation to absent with medical leave when she provided documentation. ECF No. 142-1 at 3.

### Final Return to MBU

In late June 2013, Spinelli advised the Law Department that she had "recovered from the effects of a hostile environment" and indicated that she planned to return to the Law Department in July. ECF No. 142-1 at 116.

On July 8, 2013, Spinelli returned to MBU and was given a desk outside Montana O'Connor's office. The same day, Spinelli received an e-mail from EEO Officer Muriel Goode-Trufant asking if Spinelli wanted a "continuation" of the "accommodation" regarding her "arrival time." ECF No. 193-11 at 11. She confirmed. Id.

When Spinelli returned in July 2013, Montana O'Connor wrote that she would be "primarily performing clerical tasks." ECF No. 142-1 at 158. These tasks included making

folders, processing authorizations, reviewing and inputting summaries of expert disclosures,

answering Montana O'Connor's phone, providing backup coverage at the EBT Desk, and

serving as a backup at the reception desk. Id. at 9. Spinelli continued to take issue with these

tasks and refused to provide backup coverage at the reception desk, receive EBT desk training,

or provide EBT backup. Id. at 9-10.

On August 22, 2013, because of her purportedly insubordinate behavior, Montana

O'Connor requested that Spinelli meet with the Law Department's Chief of Labor and

Employment Law, Eric Eichenholtz. ECF No. 142 at 10.

The same day, Eichenholtz told Spinelli that the Department Advocate was considering

possible disciplinary charges against her. Id. at 121. He asked to meet with Spinelli and a union

representative to discuss the possible charges. A few days later, Spinelli met with Eichenholtz

and other members of the Law Department without her union representative, maintaining that the

union would not represent her. Id. at 70, 137. On September 5, 2013, she resigned from the Law

Department.

## DISCUSSION

## I.  Summary Judgment Standard

The court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party must

show that "under the governing law, there can be but one reasonable conclusion as to the

verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "[T]he trial court's task at

the summary judgment motion stage of the litigation is carefully limited to discerning whether

there are any genuine issues of material fact to be tried, not deciding them. Its duty, in short, is

confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., LP, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. "Even where facts are disputed, in order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001).

In determining whether summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. See Scott v. Harris, 550 U.S. 372, 378 (2007); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). To create a disputed fact sufficient to deny summary judgment, the non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Rather, a party's response "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation and internal quotation marks omitted).

Because "summary judgment is a drastic device that cuts off a party's right to present his case to a jury," the moving party "bears a heavy burden of demonstrating the absence of any material issues of fact." Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2d Cir. 1999) (internal quotation marks omitted). An "extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (internal quotation marks omitted).

## II.    Age Discrimination

### A.    The ADEA Claims

The Court should grant the defendants summary judgment on Spinelli's ADEA claims because she failed to file her federal complaint within 90 days after receiving her right-to-sue letter and the record discloses no basis for tolling the statutory period. Even assuming that the statute of limitations could be tolled, the Court should grant summary judgment on the ADEA claims because Spinelli has not documented lost wages or any other economic harm.

### 1.    Time Bar

The defendants argue that Spinelli's ADEA claims are time-barred because she failed to bring them within 90 days of receiving her right-to-sue letter from the EEOC. No ADEA lawsuit may be filed until after filing an EEOC charge, 29 U.S.C. § 626(d)(1), and any lawsuit must be brought within 90 days after receiving a right-to-sue letter, 29 U.S.C. § 626(e). "While the 90-day rule is not a jurisdictional predicate, in the absence of a recognized equitable consideration, the court cannot extend the limitations period by even one day." Johnson v. AL Tech Specialties Steel Corp., 731 F.2d 143, 146 (2d Cir. 1984) (internal quotation marks omitted).

Spinelli's ADEA claims are time-barred. By her own account, she received her right-to-sue letter on June 30, 2013. See ECF No. 193-12 at 6. Her complaint was therefore due by Monday, September 30, 2013. But Spinelli waited until October 7, 2013 to file, and her complaint was seven days late.[1]

Spinelli argues that the Court should excuse her untimely complaint because the defendants "lulled" her into "inaction." ECF No. 193-12 at 6. According to Spinelli, she delayed the filing of her complaint because of July 2013 assurances from Law Department personnel that her "FMLA rights would be honored" and that she would be "assigned as a paralegal." Id. She argues that those assurances were shown to be false when, on July 29, 2013, Orcutt assigned her to cover the reception desk.

Equitable estoppel "is invoked in cases where the plaintiff knew of the existence of" her "cause of action but the defendant's misconduct caused" her "to delay in bringing" her "lawsuit." Cerbone v. Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 49-50 (2d Cir. 1985). The doctrine applies where the employer has "lulled the plaintiff into believe that it was not necessary for" her "to commence litigation." Dillman v. Combustion Eng'g, Inc., 784 F.2d 57, 61 (2d Cir. 1986) (internal quotation marks omitted). "Equity will not actually lift the procedural bar, however, unless the plaintiff shows that" she "(1) was unaware of or unable to meet" her "procedural obligations (2) because of affirmative misconduct on the part of the defendant." Avillan v. Potter, 01-cv-1648 (SHS), 2002 WL 252479, at *3 (S.D.N.Y. Feb. 21, 2002).

The record does not show that Spinelli was lulled into inaction on filing her ADEA claim. The July 2013 emails include assurances that Spinelli's "main desk will not be the receptionist

---

[1] June 30, 2013 was a Sunday, so Spinelli probably did not receive the right-to-sue letter on that date. But even assuming that she received the letter on July 1, 2013, her complaint still would have been due on Monday, September 30, 2013, because it was the next business day after 90 calendar days.

desk" and that she would not be reassigned to the EBT desk. ECF No. 193-12 at 2-3. Spinelli has

not provided any evidence that these emails were false. She cites an email from Orcutt asking her

to "cover" the reception desk "Thursday morning til 1." Id. at 5. But Orcutt's email is consistent

with the earlier assurances. Spinelli could only "cover" the reception desk because it was not her

main desk assignment. No evidence suggests that she was actually stationed at the receptionist

desk or the EBT desk. In short, Spinelli cannot show that the defendants' email assurance were

misleading. But even assuming that they were, Spinelli knew they were false by July 29, 2013,

when Orcutt assigned her to cover the receptionist desk. She has not shown that this alleged

misconduct prevented her from meeting her procedural obligations. More than two months

remained between Orcutt's email and the statutory deadline to file her complaint. She did not act

diligently during that period, and equity cannot extend her time to file the complaint.

Because Spinelli appears pro se, the Court will also consider whether equitable tolling

might save her complaint. "When determining whether equitable tolling is applicable, a district

court must consider whether the person seeking application of the equitable tolling doctrine (1)

has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has

proved that the circumstances are so extraordinary that the doctrine should apply." Zerilli-

Edelglass v. New York City Transit Authority, 333 F.3d 74, 80 (2d Cir.2003) (internal quotation

marks omitted).

Spinelli does not argue and the record does not disclose any basis for equitable tolling.

Spinelli gives no reason for her delayed filing except a vague accusation that the defendants

misled her into believing that she would be "assigned as a Paralegal so that the Statute of

Limitations would run out and I would be barred from filing in Federal Court . . . ." ECF No.

193-12 at 6. She has not demonstrated that she acted with diligence throughout the time period

she seeks to have tolled, and she has not proven that extraordinary circumstances prevented her from filing. Nor does the record suggest any other impediment prevented her from filing her complaint. Accordingly, the Court should grant the defendants summary judgment on her ADEA claims.

### 2.        Lack of Economic Damages

Even assuming that Spinelli had a basis for tolling the statute of limitations, she has not proven that she can recover damages under the ADEA. The ADEA authorizes only the recovery of lost wages or other economic loss. It does not authorize recovery for emotional distress or punitive damages. See Johnson, 731 F.2d at 146-47. Spinelli has not documented any lost wages caused by the defendants' alleged discrimination and has not proven any economic loss. Nor has she requested any injunctive relief. Even assuming that Spinelli's ADEA claim should survive summary judgment, the Court should grant the defendants summary judgment on the question of damages and dismiss the ADEA claims.

Spinelli might argue that she lost wages due to a constructive discharge and that those lost wages would constitute economic damage for the purpose of the ADEA. But, as the Court discusses at greater length below, Spinelli cannot prove a constructive discharge.

### B.        The NYSHRL Claims

Spinelli also brings her age discrimination claims under the NYSHRL. Unlike her ADEA claims, her NYSHRL claims are not time-barred. On the merits, Spinelli has shown that genuine issues of material fact prevent the Court from entering summary judgment on these claims.

### 1.        Time Bar

Unlike the ADEA, the NYSHRL does not require administrative exhaustion. Claims brought under the NYSHRL "are subject to a three-year statute of limitations, which is tolled for

the period between the filing of the EEOC charge and the issuance by the EEOC of a right-to-sue letter." DeNigris v. New York City Health & Hosp. Corp., 861 F. Supp. 2d 185, 192 (S.D.N.Y. 2012); see N.Y. CPLR § 214(2). The issuance of a right-to-sue letter does not restrict a plaintiff's time to file an NYSHRL complaint.

Spinelli alleges discrimination in 2012 and 2013. She filed her complaint on October 7, 2013, and, thus, her NYSHRL claims are timely.

### 2.    Damages

Unlike the ADEA, the NYSHRL provides damages for mental anguish and emotional distress as well as economic loss. See, e.g., Div. of Human Rights v. Ben Rottenstein Assoc., Inc., 89 A.D.3d 852, 853 (2d Dep't 2011). Although Spinelli has not provided a basis for showing economic loss, a reasonable jury could conclude that the defendants' alleged discrimination caused emotional harm.

### 3.    Merits Review

The NYSHRL prohibits age-based employment discrimination against any person 18 years old or older. See N.Y. Exec. Law § 296. The elements of a discrimination claim under the NYSHRL and the ADEA "are essentially the same" and courts "apply the same standards for analyzing age discrimination claims under both statutes." Brannigan v. Bd. of Educ. of Levittown Union Free Sch. Dist., 18 A.D.3d 787, 789 (2d Dep't 2005); see also Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist., 374 F.3d 66, 71 n.2 (2d Cir. 2004).

In the context of summary judgment, age discrimination claims are reviewed under the burden shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010); Spiegel v.

Schulmann, 604 F.3d 72, 80 (2d Cir. 2010) (applying McDonnell Douglas to employment discrimination claims under the NYSHRL).

First, a plaintiff bears the burden of establishing a prima facie case of age discrimination. See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005). A prima facie case requires showing that the plaintiff: (i) was part of the protected class; (ii) was qualified for her position; (iii) suffered adverse employment action; and (iv) the adverse action occurred under circumstances giving rise to an inference of discrimination. Id. Plaintiff's initial burden is "minimal." Id. Once a prima facie showing is made, the burden shifts to the defendants to provide a "legitimate, nondiscriminatory reason" for the adverse employment action. Id. If the defendants meet this burden, the plaintiff must prove that the reasons offered by defendants are pretextual. Id.

Spinelli satisfies the first two elements necessary to establish a prima facie case without dispute. She was (i) a member of the protected class, and (ii) qualified for her position. But genuine disputes of material fact exist as to the last two elements: (iii) whether she suffered adverse employment action, and (iv) whether that action gives rise to an inference of discrimination. A dispute also persists over the defendants' proffered reason for diminishing her responsibilities.

### a.      Membership in a Protected Class and Qualifications

The parties do not dispute that Spinelli satisfies the first two elements her discrimination claims, and there is no basis for doing so. The NYSHL protects all employees 18 years of age or older from employment discrimination based on age. See N.Y. Exec. Law § 296(3-a)(a). To show that a plaintiff was qualified for a position, she must show only that she "possesses the basic skills necessary for performance of the job." Slattery v. Swiss Reinsurance Am. Corp., 248

F.3d 87, 92 (2d Cir. 2001) (internal quotation marks and alteration omitted). Spinelli's age placed her within the protected class, and her civil service test score and prior work and educational experience qualified her for the paralegal position.

### b.    Adverse Employment Action

An adverse employment action is a "materially adverse change in the terms and conditions of employment." Bermudez v. City of New York, 783 F. Supp. 2d 560, 576 (S.D.N.Y. 2011) (internal quotation marks omitted). To be considered materially adverse, a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir 2000) (internal quotation marks omitted). Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id. (internal quotation marks and alteration omitted).

### i.    Constructive Discharge

Spinelli argues that her September 2013 resignation amounted to a constructive discharge because she believed that she was about to be fired because of her age. "To establish a constructive discharge, a plaintiff must show that the employer deliberately made" her "working conditions so intolerable that" she "was forced into an involuntary resignation." Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360 (2d Cir. 1993) (internal quotation marks and alterations omitted). "The Court of Appeals for the Second Circuit has not held that imminent discharge constitutes a separate means from intolerable working conditions of demonstrating constructive discharge." Hamilton v. Sirius Satellite Radio, Inc., 375 F. Supp. 2d 269, 276 (S.D.N.Y. 2005). A constructive discharge cannot be established "simply through evidence that an employee was

dissatisfied with the nature of [her] assignments." Stetson, 995 F.2d at 360. Courts have "refused to find a constructive discharge where an employee had an avenue through which [she] could seek redress for the allegedly 'intolerable' work atmosphere" but that she "failed to take advantage" of it. Silverman v. City of New York, 216 F. Supp. 2d 108, 115 (E.D.N.Y. 2002).

The record shows no evidence that Spinelli's work atmosphere had become so intolerable that she had to resign. In August 2013, one week before her resignation, Spinelli met with Eichenholtz to discuss her refusal to complete her assigned tasks. Eichenholtz told Spinelli that the Law Department was considering disciplinary charges against her but explicitly denied that the Department had any immediate intention to fire her. He also told Spinelli that she had a variety of avenues open to her for seeking redress of the purportedly intolerable work atmosphere, including contacting her union and filing formal grievances against her supervisors. Instead of pursuing these avenues, Spinelli quit her job. She has failed to show that her resignation was a constructive discharge, and summary judgment should be granted to the defendants on this issue.

### ii.   Diminished Work Responsibilities

Spinelli also argues that her diminished work responsibilities amounted to adverse action. Where an employee is not formally demoted, diminished work responsibilities constitute an adverse employment action if the diminishment is "so significant as to constitute a setback to the plaintiff's career," such as greatly decreased prestige. Galabya, 202 F.3d at 641. For example, in Rodriguez v. Bd. of Ed. of Eastchester Union Free Sch. Dist., the court found adverse employment action where a junior high school art teacher with twenty years of experience was transferred to an elementary school position without a loss of salary. The two jobs were "profoundly different" and the transfer rendered "utterly useless" the teacher's "twenty years of

experience." 620 F.2d 362, 366 (2d Cir. 1980). In a phrase, the transfer represented "a severe professional trauma." Id. (internal quotation marks and alteration omitted).

In Henry v. Nassau Health Care Corp., the court found a genuine triable issue on the question of adverse action where a plaintiff previously responsible for negotiating contracts was transferred to a new position that entailed mainly clerical tasks and did not require use of her educational background and skills. 08-cv-2398 (DRH) (GRB), 2013 WL 5537125 (E.D.N.Y. Oct. 7, 2013). Similarly, in Kessler v. Westchester Cty. Dep't of Soc. Servs., the plaintiff created a genuine triable issue on the question of adverse action because he retained his title only in name but lost all job responsibilities post-transfer. 461 F.3d 199 (2d Cir. 2006). And in Brady v. Wal–Mart Stores, Inc., significantly diminished material responsibilities amounted to adverse employment action where an employee was transferred from working in pharmacy to working in parking lot. 531 F.3d 127 (2d Cir. 2008). In Hrisinko v. New York City Dep't of Educ., the court found adverse employment action where a permanent teacher was made to become a substitute teacher, "arguably a less distinguished title, involving diminished responsibilities," although his salary and benefits remained the same. 369 F. App'x 232, 235 (2d Cir. 2010).

But "the mere fact that an employee has been transferred or that [her] job responsibilities have changed is not sufficient in itself to show an adverse change in working conditions." Cooper v. New York State Dep't of Human Rights, 986 F. Supp. 825, 828 (S.D.N.Y. 1997). The assignment of "minor, additional duties," especially tasks an employee has done before, "may be minor annoyances. But they are not materially adverse changes . . . ." Brown v. City of New York, 11-cv-2915 (PAE), 2013 WL 3789091, at *16 (S.D.N.Y. July 19, 2013) (internal quotation marks omitted).

Spinelli held the position of Paralegal Aide in New York City's civil service. Her job description required her to perform paralegal work "of varying degrees of difficulty and responsibility" including assisting "in the management of cases," and performing routine paralegal tasks such as drafting documents and conducting legal research." ECF No.193-2 at 7. Examples of typical tasks include maintaining control of all relevant data and documentation pertaining to cases, updating case files, managing attorney calendars, arranging and overseeing service of legal papers, filing motions and support documents, preparing pleadings, interviewing clients, performing legal research, compiling reports, collecting evidence, investigating, and assisting other paralegals ECF No. 142-1 at 184

Despite retaining her title and salary, Spinelli claims that by April 2012, she was assigned only clerical tasks and no paralegal tasks. The record supports her assertion. In an April 2012 email circulated to Spinelli's colleagues, Montana O'Connor designated her the office's "full-time receptionist." ECF No. 193-3 at 5. And when Spinelli returned from her leave of absence in July 2013, Montana O'Connor wrote that she was "primarily performing clerical tasks." ECF No. 142-1 at 158. These tasks included making folders, processing authorizations, reviewing and inputting summaries of expert disclosures, answering Montana O'Connor's phone, providing backup coverage at the EBT Desk, and serving as a backup at the reception desk. Id. at 9. A jury could conclude that this diminution of responsibilities would devastate her career. Her new assignments reduced her exposure to substantive paralegal work, and a jury could conclude that she became less employable as a result.

Defendants claim that this diminution in responsibilities was not adverse because the clerical tasks assigned to Spinelli had historically been assigned to her and were divided among other paralegals. Montana O'Connor specifically said that for those reason she did not think that

the lower-level work assigned to Spinelli was problematic. Yet Spinelli testified that she was the only paralegal ever reduced to a receptionist. And although the record contains sufficient evidence that responsibilities were shared generally, there is question as to whether other employees sharing Spinelli's title assumed lower-level responsibilities to the same degree as Spinelli, or merely provided her backup, and whether they took over her more challenging work completely.

Spinelli has provided enough evidence to show a dispute over whether her job duties were diminished and whether that diminishment was an adverse employment action under the NYSHRL. Spinelli can show that she held a position as a Paralegal Aide, which has a specified set of assigned duties. And, while she maintained the title and pay associated with that position, she argues that her primary assignments consisted of duties of a lower position in New York's civil service. She can bolster her argument with Montana O'Connor's department-wide email stating that Spinelli had been designated the office's "full-time receptionist." A reasonable jury could conclude that this diminution of responsibility—and its very public announcement—could constitute a "severe professional trauma," Rodriguez, 620 F.2d at 366, and a "setback to the plaintiff's career," Galabya, 202 F.3d at 640.

### c.      Inference of Discrimination

Spinelli argues that she suffered disparate treatment that gives rise to an inference of discrimination. At this stage of the McDonnell Douglas analysis, the plaintiff's burden is "de minimis." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994) (internal quotation marks omitted and alteration omitted). An inference of discrimination can be drawn from all of the evidence in the record. "Although evidence of one stray comment by itself is usually not sufficient proof to show age discrimination, that stray comment may bear a more

ominous significance when considered within the totality of all the evidence." Carlton v. Mystic

Transp., Inc., 202 F.3d 129, 136 (2d Cir. 2000) (internal quotation marks omitted).

Spinelli has met her minimum burden at this stage of the analysis. She alleges that

Montana O'Connor made certain derogatory statements about her age—asking how long Spinelli

could continue to work and referring to her as "mature"—at the same time that Spinelli was

assigned to be a "full-time receptionist." Spinelli has established that she was the only paralegal

who was demoted in this way and that the other paralegals in her division were significantly

younger than she was. From this evidence, a factfinder could conclude that Spinelli suffered

disparate treatment in her work assignments and that the cause was Montana O'Connor's

discriminatory animus.

The defendants argue that the "same actor inference" undermines Spinelli's prima facie

case. "When the same actor hires a person already within the protected class, and then later fires

that same person, it is difficult to impute to her an invidious motivation that would be

inconsistent with the decision to hire." Carlton 202 F.3d at 137 (internal quotation marks

omitted). But "the length of time between the hiring and firing of an employee affects the

strength of the inference" because over the years "an individual may develop an animus towards

a class of people that did not exist when the hiring decision was made." Id. at 138.

The same actor inference does not undermine the inference of discrimination at this stage

of McDonnell Douglas for two reasons. First, Montana O'Connor had limited discretion to hire

Spinelli. The one-in-three rule required Montana O'Connor to choose from the three applicants

with the highest scores on the paralegal exam. Her choice of Spinelli, therefore, does not carry as

much probative weight as it would if she had had unfettered hiring discretion. Second, a

significant period of time passed between Spinelli's hiring and the adverse employment action.

Montana O'Connor first hired Spinelli in 2008. The adverse employment action happened four years later, in 2012, when Montana O'Connor had to accept Spinelli into the MBU over her objection. Given the amount of time that passed—and Montana O'Connor's animosity at having to accept Spinelli back into the MBU unit—any same actor inference is highly attenuated.

In short, Spinelli met her initial, minimal burden of proof under the McDonnell Douglas burden-shifting framework.

### d.     The Defendants' Non-Discriminatory Reason for Adverse Action

The defendants argue that they had legitimate, non-discriminatory reasons for diminishing Spinelli's work responsibilities. According to the defendants, Spinelli "underachieved" at her work assignments and was an "unreliable employee who could not be "trusted to complete her project timely or correctly." ECF No. 141 at 22 (Ds.' Mem. of Law). As a result, the defendants argue, Montana O'Connor assigned Spinelli simple tasks and projects, including clerical work.

When a defendant offers a "legitimate, nondiscriminatory reason for the adverse decision or action," the "presumption of discrimination created by the prima facie case drops out of the analysis and the defendant will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably support a finding of prohibited discrimination." Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 767 (2d Cir. 2002) (internal quotation marks omitted). The plaintiff has "the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000) (internal quotation marks omitted). A plaintiff may do so by "showing that the employer's proffered explanation is unworthy of credence." Dister v. Continental Grp., Inc., 859 F.2d 1108, 1112 (2d Cir. 1988) (internal

quotation marks omitted). "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).

Spinelli argues that this defense is pretextual because it is not true. She argues that the record is devoid of any contemporaneous evidence that she underperformed at work. In the absence of such evidence, Spinelli denies that her work performance was unsatisfactory. The defense is nothing more than a post facto justification for discrimination conjured up to defend this lawsuit.

Instead of documentary evidence, the defendants rely on affidavits from former supervisors who testify that Spinelli's work was subpar. Montana O'Connor wrote that Spinelli "underperformed" at the MBU between 2008 and 2010, "lacked a working knowledge of the City's client agencies," struggled "to keep abreast of her assignments," and failed to complete her work in a timely manner. ECF No. 142-1 at 7. She also wrote that Spinelli received an "unsatisfactory" rating in a performance evaluation. Id. The record, however, does not include any contemporaneous performance evaluation rating Spinelli as "unsatisfactory." But the record does include four performance evaluations from 2009 and 2010 consistently rating Spinelli's work as "good" or "outstanding" and noting consistent improvement. One review encouraged Spinelli's supervisors to assign her more challenging work. In a 2009 email exchange, Montana O'Connor told Spinelli that she stood by her positive evaluations of Spinelli after a Law Department representative told Spinelli that her work "was not good enough." ECF No. 193-4 at 10.

Similarly, Broderick and Savasta both provided affidavits declaring that Spinelli had underperformed while she was located in at the SITU and MRU. Broderick wrote that Spinelli "had difficulty with completing assignments and staying organized," failed to properly draft or copy documents, and "had significant issues with lateness and attendance." ECF No. 142-1 at 24-25. According to Savasta, Spinelli "fell behind completing her assignments," and commingled data such that "the work had to be redone either by plaintiff or the reviewing attorney." ECF No. 142-1 at 19. (Other allegations Savasta made are hearsay and not properly considered in a motion for summary judgment.) But Spinelli denies each allegation made by Broderick and Savasta, and the record contains no contemporaneous evidence of underperformance, such as negative performance reviews or emails from supervisors. Moreover, there is no evidence that the defendants took any action to discipline Spinelli before the August 2013 meeting with Eichenholtz, which happened after the arguably adverse employment action. No disciplinary proceedings or even written admonishments appear in the record to support the defendants' allegations.

In one stray example of contemporaneous documentation of Spinelli's alleged underperformance, Montana O'Connor wrote in an email that Spinelli was a "marginal person" and a "so-so employee" whom she regretted accepting back to the MBU in 2012. ECF No. 142-1 at 101. She complained that because of good reviews she had given Spinelli in the past, she was being "blamed for her poor performance." Id. But these emails can also be read in another way— as evidence of Montana O'Connor's age bias. After Montana O'Connor suggested that she would assign Spinelli clerical tasks, her colleague Michael Chardirjian responded: "unless she completely lost it, she was able to do it before she left us." Id. Montana O'Connor agreed, responding with a longer list of clerical tasks and writing: "no thinking required, pure data

entry." Id. A reasonable jury could conclude that this exchange demonstrated an age-based bias—a fear that Spinelli was experiencing age-related cognitive decline—and disregard the defendants' proffered non-discriminatory reason for the arguably adverse employment action.

In short, this is not a case where "extremely well documented" employment shortcomings justify summary judgment. Mattera v. JPMorgan Chase Corp., 740 F. Supp. 2d 561, 573 (S.D.N.Y. 2010). The defendants rest their case on affidavits prepared for this litigation. The absence of undisputed record evidence supporting their assertions means that the Court cannot enter summary judgment without making a credibility finding. The jury, not the Court, should make such a finding.

The Court understands that McDonnell Douglas places the burden of production, not of persuasion, on the defendants. At trial, Spinelli will have to carry the burden of proof upon a proffer that the defendants took any adverse employment action for non-discriminatory reasons. This burden is a heavy one, and Spinelli will ultimately have to convince the jury both that the employment action taken against her was adverse within the meaning of the discrimination laws and that, it was made because of her age. The standard she must meet at the final prong of McDonnell Douglas is not settled—she may have to prove that age discrimination was the *only* reason that the defendants did what they did, the so-called "but-for" cause. But even if she has to prove only that age discrimination was one of the reasons for any adverse action—a so-called "mixed motives" theory—she will have to show that the defendants would not have taken adverse action based on her poor performance alone.[2]

---

[2] To prevail under the ADEA, a plaintiff must show that age discrimination was the but-for cause of the adverse employment action, but the standard under the NYSHRL is unsettled. In Gross v. FBL Fin. Servs., Inc., the Supreme Court held that an ADEA plaintiff "retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." 557 U.S. 167, 177 (2009).

The defendants argue that the NYSHRL's age discrimination provision should be read in light of Gross. Indeed, several courts have assumed without deciding that NYSHRL age discrimination claims require showing but-for

## III.     The Hostile Work Environment Claims

Spinelli also brings claims for a hostile work environment under the ADEA and the NYSHRL. As noted above, her ADEA claims are time-barred. Her NYSHRL claims are meritless because no jury could conclude that she suffered pervasive harassment due to her age.

_____

causation. See, e.g., Barone v. S & N Auerbach Mgmt., Inc., 15-109, 2016 WL 1237871, at *1 (2d Cir. Mar. 30, 2016); Mikinberg v. Bemis Co., Inc., 555 F. App'x 34, 35 (2d Cir. 2014); DeKenipp v. New York, 97 A.D.3d 1068, 1069-70 (3d Dep't 2012); Anderson v. Young & Rubicam, 68 A.D.3d 430, 431 (1st Dep't 2009); Szewczyk v. City of New York, 15-cv-918 (MKB), 2016 WL 3920216, at *9 n.8 (E.D.N.Y. July 14, 2016); Allen v. Chanel, Inc., 12-cv-6758 (LAP), 2015 WL 3938096, at *4 (S.D.N.Y. June 26, 2015); Najjar v. Mirecki, 11-cv-5138 (KBF), 2013 WL 3306777, at *7 (S.D.N.Y. July 2, 2013).

There is some heft to this argument. The ADEA prohibits discrimination against certain employees "because of such individual's age." 29 U.S.C. § 623(a)(1). In Gross, Court held that "the ordinary meaning of the ADEA's requirement that an employer took an adverse action 'because of' age is that age was the 'reason' that the employer decided to act." Gross, 552 U.S. at 176. In the wake of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), Congress amended Title VII to provide liability when discrimination was a "motivating factor," and, thus, mixed motives cases are still permissible under that statute. But, because Congress failed to so amend the ADEA, the Court reasoned, it did not intend to authorize mixed motives cases under that statute. Gross, 552 at 178 n.5. Like the ADEA, the NYSHRL prohibits discrimination "because of" age (and certain other protected traits) but, unlike Title VII, it does not provide liability when discrimination was only a "motivating factor." See N.Y. Exec. Law § 296. Thus, under the Supreme Court's statutory analysis, the NYSHRL would not authorize mixed motives cases, and Spinelli would be required to prove that age discrimination was the but-for cause of the adverse employment action.

But there is a major problem with this analysis. Gross based its holding on the fact that "Title VII is materially different" from the ADEA "with respect to the relevant burden of persuasion." Gross, 577 U.S. at 173. The NYSHRL, however, uses the _same language_ as the ADEA to prohibit discrimination "because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status." N.Y. Exec. Law § 296(1)(a). The NYSHRL does not provide for "motivating factor" liability for _any_ of the prohibited bases of discrimination. If Gross ended mixed motives age discrimination cases because the NYSHRL uses the same "because of" language as the ADEA, it would follow that Gross also ended mixed motives discrimination cases involving _every other_ characteristic protected by the statute. This conclusion would call into question the New York decisions that continue to find that the NYSHRL authorizes mixed motives cases in the context of race and sex discrimination. See, e.g., Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 687 (S.D.N.Y. 2011); Holleman v. Art Crating Inc., 12-cv-2719 (VMS), 2014 WL 4907732, at *44 (E.D.N.Y. Sept. 30, 2014); Lennert-Gonzalez v. Delta Airlines, Inc., 11-cv-1459 (JMF), 2013 WL 754710, at *7 (S.D.N.Y. Feb. 28, 2013);  Dixon v. Int'l Fed'n of Accountants, 09-cv-2839 (HB), 2010 WL 1424007, at *3 (S.D.N.Y. Apr. 9, 2010).

The Supreme Court's interpretation of federal statutes does not control the interpretation of New York law, and, in the absence of a controlling New York case holding otherwise, Spinelli can argue a mixed motives theory of liability at trial.

"A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it. A plaintiff must demonstrate that she was subjected to the hostility because of her membership in a protected class." Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999) (internal citation omitted); see also Preuss v. Kolmar Labs, 970 F. Supp. 2d 171, 184 (S.D.N.Y. 2013) (NYSHRL claims must be analyzed under the same standard). A hostile work environment claim is evaluated based on "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening and humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002).

Spinelli alleges that Montana O'Connor made two age-related comments: calling Spinelli "mature and responsible" and asking her how long she could continue to work. Taken together with the diminution of Spinelli's work responsibilities, these remarks were sufficient to raise an inference of discrimination. But the remarks alone are not enough to establish a hostile work environment. Even "despicable and offensive" stray remarks "fail to constitute discriminatory behavior that is sufficiently severe or pervasive to cause a hostile environment." Brown v. Coach Stores, Inc., 163 F.3d 706, 713 (2d Cir. 1998). Montana O'Connor's isolated comments, taken in context, did not constitute a hostile work environment. To the extent that Spinelli argues that Montana O'Connor's comments taken together with the diminution of Spinelli's work responsibilities constitutes a hostile work environment, that claim is duplicative of her age discrimination claim.

Spinelli also claims that she was harassed by her coworkers, who poked her, yelled at her, and criticized her. But Spinelli does not link these allegations to any discriminatory animus. The

discrimination laws do not prohibit employers from "maintaining nasty, unpleasant workplaces." Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 513 (S.D.N.Y. 2010). They prohibit only discrimination on the basis of a protected characteristic. Because Spinelli cannot establish a nexus between the unprofessional behavior at her workplace and age-based animus, she cannot establish a hostile workplace claim.

The defendants should be granted summary judgment on this question.

## IV.    The FMLA Claims

The Family Medical Leave Act ("FMLA") entitles eligible employees to "a total of 12 workweeks of leave during any 12-month period" to accommodate "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612. To be eligible, an employee must have been employed for at least one year by her current employer and have worked a minimum of 1,250 hours during the previous year. 29 U.S.C. § 2611(2)(A)(ii).

The Law Department granted Spinelli's request for FMLA leave in May 2012. She now claims that the defendants interfered with her FMLA rights and retaliated against her for taking FMLA leave. The summary judgment record supports neither claim, and summary judgment should be awarded to the defendants.

### A.    The FMLA Interference Claims

An employer may not "interfere with, restrain, or deny the exercise of" FMLA rights. Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 174 (2d Cir. 2006) (internal quotation marks omitted). Interfering with the exercise of FMLA rights "would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." Potenza v. City of New York, 365 F.3d 165, 167 (2d Cir. 2004) (quoting 29 C.F.R.

§ 825.220(b)). To prove an FMLA claim, a plaintiff must show that she was entitled to FMLA benefits, that she gave notice of her intention to take leave, and that the defendant denied benefits to which she was entitled. See Achille v. Chestnut Ridge Transp., Inc., 584 F. App'x 20, 21 (2d Cir. 2014). "Eligibility is a threshold issue, and it is insufficient for plaintiff to merely assert in a conclusory manner that [she] is eligible without stating any facts that relate to the definition of an eligible employee." Smith v. Westchester Cty., 769 F. Supp. 2d 448, 465 (S.D.N.Y. 2011) (internal quotation marks and alteration omitted).

Spinelli cannot make a prima facie showing of interference with her 2012 leave because the leave was granted and fully exhausted. The Law Department granted Spinelli intermittent FMLA leave on May 24, 2012. She stopped showing up for work entirely on August 7, 2012, and, by October 22, 2012, she had fully exhausted her leave. Spinelli claims that Orcutt tried to discourage her from using her leave in 2012 by telling her that her flexible arrival time would not make her very popular. But Orcutt's alleged discouragement did not prevent her from exercising her FMLA rights—she fully exhausted her leave. In short, the defendants did not deny Spinelli a benefit to which she was entitled.

Spinelli cannot show that the defendants interfered with any FMLA benefits when she returned to work in 2013 because she was no longer eligible for them. The statute requires an employee to work 1,250 hours in the 12 months preceding an FMLA leave request. Due to Spinelli's extended absence—she did not work between August 7, 2012, and July 8, 2013—she had not worked the required hours before returning to work and was therefore ineligible. Accordingly, she had no FMLA right with which the defendants could interfere.

Spinelli argues that EEO Officer Muriel Goode-Trufant told her that she continued having FMLA leave in 2013. But Goode-Trufant's email does not mention the FMLA at all.

Instead, it asks Spinelli whether she wished to continue her late arrival "accommodation" and informs her about a new disability rights coordinator. See ECF No. 193-11 at 11. Spinelli's mistaken belief that she was eligible for FMLA did not make her eligible as a matter of fact. See Smith, 769 F. Supp. 2d at 465.

### B.    FMLA Retaliation Claims

The FMLA prohibits retaliation for exercising FMLA benefits. To prove a case of FMLA retaliation, a plaintiff must show that she exercised FMLA rights, was qualified for her position, suffered an adverse employment action, and that the adverse employment action "occurred under circumstances giving rise to an inference of retaliatory intent." Potenza, 365 F.3d at 168. An inference of retaliatory intent "can be established when there is a basis for a jury to conclude that a causal connection exists between the plaintiff's protected activity and the adverse action taken by the employer." Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 152 (2d Cir. 2012) (internal quotation marks and alteration omitted).

Spinelli cannot show that the defendants retaliated against her by assigning her to the receptionist desk in April 2012 because it happened *before* she requested FMLA in May 2012. No causal connection could therefore be drawn from the exercise of Spinelli's rights and the adverse employment action.

Nor can Spinelli show retaliation upon her return to the MBU in 2013. A post-FMLA reinstatement negates any potential inference of retaliation. See, e.g., Alexander v. Bd. of Educ. of City Sch. Dist., 107 F. Supp. 3d 323, 330 (S.D.N.Y. 2015). Further, the summary judgment record shows that upon Spinelli's reinstatement, her conditions of work arguably improved. The defendants granted her request not to be stationed at the receptionist desk and continued to allow

her a flexible arrival time. She cannot show that any 2013 adverse employment action was caused by her FMLA leave request.

## V.      Contract and Disability Discrimination Claims

Spinelli alleges for the first time in her summary judgment opposition that the defendants breached an employment contract with her. <u>See</u> ECF No. 193 at 1. She also cites a disability discrimination case, suggesting that she might intend to argue disability discrimination under the Americans with Disabilities Act ("ADA") or the NYSHRL. <u>See</u> ECF No. 193-1 at 10 (citing <u>Brady v. Wal-Mart Stores, Inc.</u>, 531 F.3d 127, 135 (2d Cir. 2008)). Spinelli did not make these arguments in her amended complaint, and "a party is not entitled to amend its complaint through statements made in motion papers." <u>Wright v. Ernst & Young LLP</u>, 152 F.3d 169, 178 (2d Cir. 1998). Accordingly, the Court should not consider these claims on summary judgment.

## VI.     Spinelli's May 24, 2016 Filing

After receiving months of extensions, Spinelli finally filed her summary judgment opposition on April 12, 2016. <u>See</u> ECF No. 193. After reviewing her submission, Spinelli asked for permission to re-file her documents, and the Court denied her request. <u>See</u> ECF No. 196. The Court reiterated that it would only consider those documents Spinelli submitted on April 12, 2016, and certain medical records filed under seal when deciding this motion. <u>See</u> ECF No. 198. Contrary to the Court's explicit Order, Spinelli filed a new set of opposition papers on May 24, 2016. <u>See</u> ECF No. 201. The Court did not consider those papers in deciding this motion, and the Clerk of Court is directed to strike them from the docket.

## <u>CONCLUSION</u>

Summary judgment should be granted with respect to Spinelli's ADEA claims, hostile workplace claims, FMLA claims, contract claims, and disability discrimination claims. John

Orcutt should be dismissed from the case because he is a defendant only with respect to Spinelli's FMLA claims. Summary judgment should be denied with respect to Spinelli's NYSHRL discrimination claim.

The Clerk of Court is directed to strike the documents docketed at ECF No. 201. The parties are directed to file a joint letter by September 6, 2016, indicating whether they wish to schedule a settlement conference.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:    New York, New York
          August 30, 2016

\*     \*     \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the U.S. Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).